### L'HOMMEDIEU et al. v. PENNSYLVANIA R. CO.

(District Court, E. D. New York. March 19, 1912.)

SALVAGE (§§ 31, 38, 10*)—SALVAGE SERVICE—MOVING VESSEL FROM VICINITY OF FIRE.

The moving of a float, moored in the vicinity of a fire which consumed property on a pier and spread to a number of vessels and lasted all night notwithstanding the continuous work of fire boats and tugs, *held* to constitute a salvage service which entitled the vessel performing the service to an award of 10 per cent. of the value of the float, to be equally divided between the owners and crew.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 75–77, 93–102, 18–20; Dec. Dig. §§ 31, 38, 10.*

Salvage awards in federal courts, see note to The Lamington, 30 C. C. A. 280.]

---

In Admiralty. Suit by Samuel L'Hommedieu and Henry Crew, as owners of the Guiding Star, against the Pennsylvania Railroad Company. Decree for libelants.

Foley & Martin, for libelants.
Burlingham, Montgomery & Beecher, for respondents.

CHATFIELD, District Judge (orally at close of trial). The first question presented in the case was raised upon the allegations of the pleadings. The libelants alleged that other tugs at the fire were unwilling to take the risk of going in to save No. 31. This has not been substantiated, but the libel does not suggest (as has been intimated) that the other tugs were hestitating to save the boats that they were working on. When, however, we turn to the respondents' pleadings, which allege that the city fire department responded and with the aid of a number of tugs kept the fire from spreading; that the fire at no time approached nearer than 300 feet from No. 31's berth; that the watchman in charge of No. 31 went ashore to telephone that there was a fire, but that the office had already been notified and the Wilmington despatched to the rescue; that a tug removed the barge that lay between No. 31 and the pier and threw off all the lines on the float except one to await the coming of respondents' tug; that shortly afterward, before the floatman could return to No. 31, the Guiding Star entered the slip, and without any request or authority, and without any necessity, cut the lines and towed No. 31 out into the stream; that No. 31 was in no immediate danger, for there were a number of tugs ready and willing to tow No. 31 into the stream, while the Wilmington arrived within 20 minutes from the outbreak of the fire; that it was not difficult at any time to enter the slip where No. 31 lay, as it was very wide and other tugs did enter without danger—I think it is apparent that the information and point of view from which the answer was drawn are very different from the situation that existed according to the testimony.

The testimony of the respondents shows that the boat rescued was moored within 50 feet of where tug No. 10 worked all night pouring water on the fire, and where she had occasion to have water played upon her own structure to keep that from catching on fire. This is much less than 300 feet. The watchman was not on No. 31. The lines were not cast off by a tug, but by the captain of the No. 8 barge, who was getting his own boat out of what he considered danger. The Wilmington, under the circumstances, not knowing that No. 31 was there, could hardly have found her up the creek beyond the smoke and fire, and where all the other tugs now think she did not need assistance.

With a fire of this nature, which took the fire department and the tugboats all night and some of the department until Monday (the fire occurring at 6 o'clock Saturday night) to get the fire out, it can hardly be said that the fire, which seems to have started at the slip and not in the building, did not "spread" and was not "dangerous," although it was ultimately confined to the corrugated iron building. The testimony shows plainly that the first fire originated at the sur-

face of the water on the south side of the pier at Twelfth street, East River, upon which this corrugated iron building is located. A tug, the Defender, and an oil barge, No. 53, caught fire so rapidly that the crew of the tug could not get her out into the stream, even though steam was up, and then these flames spread to the pier and broke through the corrugated iron building so quickly that the tug, No. 4, at the outer end of the dock, caught on fire, although the watchman went around immediately to give warning, and although the Guiding Star arrived there within a very few moments and attempted to take her away; the flames interfering even with that. The flames worked through the corrugated iron building so as to set fire to barge No. 54 before that could be taken away by the Standard Oil tugs, who were there according to rule to save the floating property before they began to play on the fire. The Standard Oil tug No. 9, assisted by No. 10 and under streams of water from No. 10, finally removed barge No. 54, in which the M. Moran helped before No. 54 was entirely out of the slip. The fire and smoke swept out over the creek on the north side of this pier so that the captain of tug No. 10 thought it was dangerous to take No. 31 out of the slip; and, under those circumstances, the possibility that the Wilmington would have gone in and rescued a float, which she did not know about, is not only slight, but the probabilities are against her doing anything of the sort.

As to No. 10, she was in a position where she could have taken out either the barge or float, but her captain assumed that they were not in danger at that time, and that no more floating property had to be saved first. He went at the fire immediately and certainly performed excellent service, sticking close to the fire and working at it with lines of hose and the stationary nozzle. His judgment from that time on, as to whether he would better stick to the fire or stop and take the boat out, is not persuasive as to the propriety of saving the barges. If the fire had lasted only a few moments, the judgment of the captain of No. 10 would have been vindicated. If the risk had been terminated in a few minutes, the salvage award would have to be very small. But when a fire lasted all night at that precise point, and destroyed as much property and as many boats as this fire did, and when it required that amount of fighting to confine it to a building, so that it could not spread to oil tanks immediately adjacent, there was in the opinion of the court a salvage service rendered to all boats in the immediate vicinity, and to which the danger might have spread.

The testimony shows that the captain of No. 10 was correct in the sense that the boats might have been protected where they were, but the province of the court in allowing salvage is not to act as an insurance company in adjusting damage and to decide whether or not the risk developed into a loss, but it is to determine whether or not people ought to be encouraged to anticipate the risk and avoid the possibility of loss at a time when a loss has not yet occurred, but is apparently possible and can be successfully avoided by the act of rescue.

The value of the property is over $8,500. It is apparent that float No. 31 was not as inflammable as the oil barges or boats which had anything connected with the oil traffic on board, but its cargo was

wood and certainly would have burned easily. Float No. 31 evidently swung out into the stream somewhat, so that when the captain of barge No. 8 pulled around the stern of No. 31, he succeeded in getting his boat, with the help of the tide, across to the Quay street side. The position of No. 31 must have been such that as viewed from any place out in the slip she would seem to have been well across toward Quay street, yet at that condition of the tide it would have been easy for the tug to have swung around her stern in the space called the "Hook" at the Quay street dock, and to run up along the starboard side of the float, as her captain says he did.

The testimony as to other matters, the presence of the boats in their slips, and their relative positions at different times, does not affect the question any further than I have already indicated.

I think an award of 10 per cent. or $850 is adequate, and a decree may be had for that amount, one-half to go to the crew, who deserve that much in this case.